Thank you, your honors. May it please the court. My name is Zach Poppe and I represent the appellant, Mr. Garfield Holley. The district court dismissed Mr. Holley's case without prejudice under the three strikes rule of the Prison Litigation Reform Act, finding that Mr. Holley had not alleged that he was in imminent danger of serious physical injury at the time he filed his complaint. This court should reverse the district court's dismissal of Mr. Holley's case for two reasons. First, Mr. Holley pled two ongoing physical injuries that satisfy the imminent danger of serious physical injury exception under Hull. And second, Mr. Holley pled a pattern of misconduct that independently satisfies the imminent danger exception. When you say pled, do you mean in the original motion or in the Rule 59 motion? He pled imminent danger in both the admitted complaints and the documents before the district court, as well as the Rule 59e motion to alter or amend the judgment. Okay. It would be helpful for me if when you're discussing the evidence, if you specify the evidence that was in the initial motion versus things that were in the Rule 59, because this is probably only something that a former civ pro person would think. I'm not sure you can consider evidence submitted only at the Rule 59 when attacking the dismissal of the original motion. Absolutely, your honor. I will absolutely go through both where my allegations are coming from. I will point out that we do argue that this court can consider the allegations in the motion to alter the judgment because they are not new arguments. They are a continuation of Mr. Holley's former arguments. How does our decision in Hull impact the way you approach this case? Impact the difference between the motion to alter the judgment or the... And the reconsideration. I'm not sure if Hull, because Hull was somewhat distinct in that sense in that there was not, I don't believe there was a motion to alter or amend the judgment. And the court there remanded because the plaintiff in Hull had submitted his medical records to the Court of Appeals, but not to the District Court. So the Court of Appeals found his allegations sufficient to remand. So you got allegations that a motion can reconsider. You got the original ones. Are the standards of review different? The standards of review are different. So what would it be for the reconsideration allegations? For the motion to alter the judgment, it would be an abusive discretion standard. So it would be, if this court were to find an abusive discretion that the District Court did not find a clear error of law. Well, but a clear error of law, a District Court commits a clear error of law in reference to a specific ruling in a specific record, right? I believe so, Your Honor. What I say is a District Court can't have committed a clear error of law in its ruling by not considering evidence that no one presented to them, right? It's not a clear error of law to disregard evidence that wasn't presented to the court. I would push back, Your Honor, on the fact that the evidence was very consistent with what he had presented. No, I understand. It's just a purely factual case. So let's give a stylized hypo that doesn't require you to give away anything about this case. So I, in opposition to an original motion, I say, don't grant that motion because of X and Y. The court says, I'm going to grant the motion. And then in a motion under Rule 59, someone says, well, also X, Y, and Z. That's a clear error of law. And we would say, that's not a clear error of law. You can't rely on Z in arguing the District Court committed a clear error of law in not considering Z because literally no one ever presented Z to the court when it ruled on the original motion, right? So the alternate amendment judgment inquiry is, did you make a clear error of law in denying the motion you had before you, right? Yes, that is correct, Your Honor. Okay. And then, and then when you try to present new evidence in a Rule 59 motion, I mean, again, high level of generality, you can't use Rule 59 motions generally to present new evidence. And so one of the, one of the considerations under Rule 59 is, if you're, if you're giving me new evidence at the Rule 59 stage, you're going to have to give me some reason why you couldn't have presented this before. Do you agree with that too? Yes, Your Honor. And you agree here the District Court could probably, and I think did find, you don't really have any good explanation why the new evidence at the 59 stage wasn't presented originally, right? I would, I would push back in the sense that, uh, the allegations and again, are, are the motion to alter the judgment. No, I understand. That's the facts of this case. But as a, as a broad matter, if a District Court says Rule 59 motion denied, I will not consider Z in adjudicating this Rule 59 motion because you've given me no good reason why you couldn't have presented Z originally. That would not be an abuse of discretion. Yes. Under that stylized typo. Okay. Thank you. Yes. So moving to the specific allegations and how this court is similar to Hall. First, Mr. Hawley pled two ongoing serious physical injuries related to his worsening chronic asthma and permanent disfigurement, pain, and reduced function in his hands and wrists. Under Hall v. United States, for chronic conditions, a plaintiff must show that they are continually denied necessary medical care, which has worsened their chronic conditions. And that as a result, they are experiencing serious physical injuries or severe bodily harm. The facts in Hall involved a petitioner that had alleged the government had failed to provide him with the requisite standard of care for chronic asthma, COPD, and other conditions. And the court, um, remanded his case to the District Court to reconsider his allegations in light of the entire, the full record. Here, Mr. Hawley has similar allegations to those in Hall. Mr. Hawley, mainly he alleged that he experienced multiple delays in medical care and that the delays exacerbated his chronic asthma and caused some serious injury threatening his life. Can I ask you about a difference between this case and Hall? So my understanding, it was pretty important to our decision in Hall that the plaintiff was not getting medical treatment because his appointments were repeatedly canceled for years and his condition got worse when he wasn't getting medical treatment. But here it seems like your client did get medical treatment, right? Because it doesn't appear disputed that he got some medical. His claim is I didn't get it enough. I didn't get the right treatment. That's very serious. But like, in Hall, it was like the injury was I need medical treatment. They keep not giving medical treatment. No one's giving me medical treatment. Here, it seems at minimum undisputed that the plaintiff got some medical treatment at some points, right? That is correct, Your Honor. So, uh. Why doesn't that distinction matter? Well, in, in Hall, just to restate what Your Honor said, the plaintiff had alleged that he had an initial medical appointment and, uh, but no additional appointments after that and they were canceled for a year. Um, and I, I would point this court to the, as the key inquiry to the allegations of the petitioner in Hall that the government had, quote, failed to provide the requisite standard of care to treat him for his conditions, chronic asthma, COPD. So here we have, um, initial delays of medical treatment, um, following the initial transport of Mr. Hawley, um, in a cage in 35 degree weather with no heat for six hours. And then there were delays in medical care. And then after that, we have an effective denial of treatment and that the treatments are, are not effective. And Mr. Hawley's allegations have shown that. Um, so moving to the initial delays in medical care, uh, Mr. Hawley, after he was transported in the cage, prison officials were dismissive of, uh, his health problems following that oral surgery. So he first, uh, on November 4th of 2018, a few days after the oral surgery appointment, he went to the sick call nurse complaining of nosebleeds and the sick call nurse dismisses the nosebleeds as normal. Um, three weeks later, Mr. Hawley came back, uh, suffering acute shortness of breath. Are all of these allegations are in the original or are you starting to add in things that are in the rule? Oh, I apologize, your honor. These are all, uh, these are all in the original and or the admitted complaint. And I will point out. But not the rule 15. Okay. Nothing you've said so far. Okay. Thank you. Yes, your honor. I will, I will. Appreciate it.  No, no, no. Um, so the, so he, he, he does admit that at that point he did get an emergency breathing treatment, but then he alleges that the sick call nurse commanded him to refuse medical housing. And it was, he, he was, he alleges that he was told that the physician would be at his cell two days later. It wasn't until three days later that the prison officials found Mr. Hawley on the floor of his cell suffering. Um, he, he says that he was quote nearest death suffering, quote, severest Bronco spasms, life-threatening breathing, asthmatic wheezing. That is when they rolled them out. This resulted in a multi-day hospitalization and eventually a pneumonia diagnosis. Um, and still in the motion to amend or alter the judgment, Mr. Hawley, the continuing, um, ongoing effects of these symptoms, Mr. Hawley alleges he attaches a regular grievance from December, 2019 to his admitted complaints on page 31 and 39 of the joint appendix in which he describes an incident in which in December, 2019, which he was awoken suffering, um, December 19, 2019 is at the time of the original complaint, right? Uh, December, 2019 is, uh, about a year after the original complaint. So we have a two-year period and this... Sorry, not the year, but before or after the district court ruled on the initial motion? Uh, this is before, this is before, this is all before the district court had ruled. So this could have all been presented in the, so this, we're now talking about stuff that's in the rule 59 motion that had happened before the district court made its original ruling and could have been presented to the district court before its original ruling. It was presented to the district court. Oh, I'm sorry. You referenced the rule 59. I got, I'm sorry. Oh yeah, I apologize. No, I, I probably got confused. So this may help if it's page 65 of the joint appendix or before that is before the district court's order. And then if, when it's, when the motion to alter him in the judgment is in the eighties of the joint appendix. Um, so on page 31 and 39, he attaches these regular grievances from 2019, uh, describing an incident in which he awoke suffering acute shortness of breath, a racking cough every 12 to 14 minutes. Um, and he states that he has quote, no confidence in diagnoses, which amount to nothing at all. So those allegations are all in before the district court's initial order, not in the motion to alter the judgment. If this court were to consider the allegations in the motion to amend or alter the judgment, there's even more significant evidence that is consistent with the previous evidence, but clearer statements in which Mr. Hawley states that he had ongoing deteriorative effects of pneumonia and he references a quote, daily fight to stay alive. Uh, he states that the lung damage is ongoing. Um, and he attaches a couple more grievances in which more delays of medical care, uh, in which that one request for a breathing treatment was ignored for eight days and another request for breathing treatment was not responded to for 11 days. So can I, one last question on Hall. So you quoted that requisite standard of care that was in Hall's complaint, but the court's opinion in Hall doesn't say that's the standard for imminent danger, does it? The court's opinion in Hall does not state that is the standard. And the standard that's stated in Hall is that, uh, that you, it, for chronic conditions, there must be a continual denial of necessary medical care, which worsens the plaintiff's conditions resulting in serious physical injury or severe bodily harm. And Mr. Hawley has alleged with the chronic as, with respect to the chronic asthma, both of those, um, under the standard of care. I have a question about, um, the mispattern and misconduct allegation, which I think is your, it's your second. Is that right? Okay. Um, what is your best authority for the proposition that general allegations of the sort of allegations of misconduct that you plead here are sufficient? What would you say is your best authority for the proposition that that's enough? I think the best authority that that is enough is Newkirk versus Kaiser, which is a opinion from this court. Um, and, and in Newkirk, there was a plaintiff that described one incident in which he was allegedly subjected to excessive force and asserted that this was not an isolated occurrence. And the plaintiff claimed that prison staff members regularly assault inmates without cause and threaten inmates who complain. And together that constituted a pattern of misconduct, evidencing a likelihood of imminent danger. So that's an unpublished opinion, right? Yes, Your Honor. It is unpublished. Okay. What's your best published authority for that proposition? Um, I, I would point back for a published authority. I would point back to the statement in Hall in which the standard is outlined, but the court did not analyze the, the allegations in Hall under the pattern of misconduct. But Hall did state, uh, quote, we have also clarified that if there is a pattern of past conduct that places an incarcerated person in imminent danger of harm, and which is ongoing, then the litigant meets the exception. So the standard is outlined for published opinions in Hall, and then in Newkirk, and then also Johnson versus Warner, another unpublished opinion in this circuit. Um, those help to flesh out what is, what does a pattern look like. Um, and so moving to the pattern here, all of the incidents alleged in the pattern that Mr. Hawley alleges, um, they're, they all share two common traits, um, making it sufficient to form a pattern. First, they all emanate from the use of excessive force. So excessive force of Mr. Hawley being the initial cage transport, and then after he was transported, he was lying in the hospital bed, uh, prison officials handcuffed him, he alleges, too resulting in half-inch deep wounds, 13-inch long gashes, uh, swelling to three times his normal size, and resulting in ongoing complications with his hands and wrists, uh, which the district court, going back to the, uh, ongoing serious physical injury, did not address whether that could constitute chronic injuries under Hall. Moving back to the pattern, um, so those two incidents, the first two incidents involving Mr. Hawley, all involved excessive force. And the, uh, the further incidents Mr. Hawley attached, uh, in the objections to the answer on page 62 and 63 of the joint appendix, he attached, uh, a Richmond Times dispatch article in which three other instances are described in which prison officials subjected, uh, other inmates to excessive force, uh, such as attacking an inmate upon the inmate's arrival at the prison, um, and refusing to classify the inmate as mentally ill despite multiple diagnoses, uh, severely beating an inmate and immediately placing the inmate, uh, in isolation, and verbally abusing an inmate and giving the inmate wrong medication. And I think it's important to note that one of the inmates in, uh, as detailed in that Richmond Times article that Mr. Hawley attached to the objections to the answer states, quote, I just want this place to do what they're supposed to do and stop beating on people. I'm not the only person that this has happened to. It happens to a lot of people. So first, all of those incidents involving Mr. Hawley and the others all involve the use of excessive force. And the second key connection that creates that connectivity between the incidents and the pattern are that they illustrate how the defendants treat inmates who are perceived to be disruptive. So for Mr. Hawley, that was for writing grievances. Mr. Hawley actually alleges that the initial cage, the way he was transported to the oral surgery appointment was retaliation for him writing a previous grievances for the delay in his oral surgery appointment. He also states that they wanted to, quote, humiliate him. They had a, quote, he asked for a breathing treatment. Uh, one of the officers responded, quote, if you ask me again about your damn breathing treatment, you'll get your taste of Lawrence Ridge state prisons beat down. So this evidence is bad in the J that is, uh, in the motion to alter the judgment and joint appendix page 83 of the joint appendix. I was pretty sure that was in the motion. Yes, your honor. But I will say the, the humiliate and the heinous dislike quote are, and the admitted complaint and the objections to the answer respectively. So the connection between the abuse on the other inmates and the alleged abuse against Holly, are you saying there's some level of systematic retaliation that's a part of this? I see him out of time, your honor. Thank you. Um, yes, I, I, I think we are saying that your is a pattern that has been evidenced with respect to Mr. Holly and the other inmates and that they treat inmates who are perceived to be disruptive with excessive force. So that was with respect to Mr. Holly, but with respect to the other inmates as to why we believe that they were, uh, seen as disruptive, um, they were writing grievances, practicing their Muslim religion, causing a disturbance in their pot or causing a disturbance at another facility. And all of the incidents of excessive force followed those initial, uh, those things evidencing that there was an intent to retaliate and they perceived those inmates as disruptive. Thank you. All right. Thank you, Mr. Poppy. Mr. Dingman. Good morning and may it please the court. Michael Dingman, Assistant Solicitor General on behalf of FLEs with me, counsel tables, Kevin Gallagher, Principal Deputy Solicitor General. Garfield Holly has a proven history of filing frivolous lawsuits. Congress enacted the PLRA to prevent frivolous lawsuits from clogging the federal court system and it prevents plaintiffs like Holly. There's no dispute that he has. And, uh, the act bars plaintiffs like Holly from proceeding IFP under those circumstances, unless he is in imminent danger of serious physical injury. But nothing in Holly's complaint alleges imminent danger of serious physical injury, nor do his other filings reveal one. Can we consider the allegations in the reconsideration motion? Under Bannister v. Davis, Your Honor, no. Uh, at least the ones that predate the, uh, the court's decision to revoke IFP status because Holly could have raised those factual allegations before, uh, that ruling. What about Hall? Hall, uh, looked like we considered some records that were only presented on appeal. Your Honor, this court didn't consider that in making its decision. It remanded so the court could consider those, uh, those records. It noted that the district court did not have the benefit of the medical records when it rendered its initial decision. And so this court in Hall did not hold that the plaintiff had. Wait, but under your understanding of, I mean, that seems like worse, not better. If you can't present new evidence in a 59 motion, it would seem a for sure. You can't present new evidence on appeal, right? That's, that's true, Your Honor. But the issue in Hall was that the plaintiff there had provided specific allegations that this court decided, uh, met the standard under the statute, but then remanded for further consideration in light of the, uh, medical records. So here there are no such allegations because Holly simply alleges ongoing effects of past injuries. He's not alleged that he's in danger of any, he's in any imminent danger of serious physical harm in the future. And that's what this court explained in Hall. In Hall, this court said that a theory of delay or denial of medical treatment must worsen a petitioner's medical condition resulting in serious physical injuries. Uh, it's not simply that there are lingering effects of ongoing injuries or that a plaintiff may prefer different types of care. There must be specific and sufficient allegations establishing that the delay or denial itself is putting the plaintiff in imminent danger. And again, just sort of put it colloquially like, um, so something bad happened to me and it's not the something bad that's going to get better with time. It's the something bad that's going to inevitably get worse with time if we don't do something about it. So like every single day we don't treat my broken arm. It's not just that my arm is not getting better. My arm is getting worse. That's exactly right, Your Honor. And the cases that, uh, hold the plaintiff meets the imminent danger standard generally involve diseases like HIV, hepatitis C, um, diseases that if they go untreated will result in a serious physical injury like, uh, organ failure or death. Van Diver is an excellent example of this. Uh, the plaintiff there provided detailed allegations that he was diagnosed with diabetes, uh, detailed allegations of the, what a physician had prescribed for him, alleged that the prison had not provided him any of that treatment, and then also alleged that in the, because the prison had denied him that treatment in the past, he had had to undergo, uh, partial amputations. But there that was not enough to meet the statute. What made it enough to meet the statute was that the prison continued to deny treatment, which put him in future danger of, uh, having further amputations. And so the issue here is that all that Hawley alleges is that he has a lingering breathing, uh, problems from his chronic asthma and his pneumonia infection, which are being treated as he concedes in his 59E motion. He's had over a hundred breathing treatments and is receiving medication for his lungs. He alleges that he has ongoing, uh, pain and sensation issues in his wrists, but he admits in his, uh, response to the motion to dismiss that he was treated for his wrist before he even was discharged from the hospital for his pneumonia infection. And while he may subjectively disagree with the type of treatment, uh, as the Third Circuit held in Ball v. Flamiglio, that's not enough, uh, under the statute unless there's a specific allegation establishing that if true, that treatment is so inadequate that it will create an imminent danger of serious physical injury in the future. But that's simply lacking here. And, uh, as for the pattern of misconduct, Your Honor, um, there's simply no nexus, uh, between the, uh, the misconduct that Hawley alleges is putting him in imminent danger at the time he filed his complaint and the allegations in the complaint. This court explained in Hawley that there must be a nexus because of the, the design of the PLRA and the three-strike rule, and the imminent danger exception is a safety valve to this three-strike rule. Here, Hawley alleges that he was injured by the conditions of a medical transport and he was handcuffed to a tightly wound in the hospital. Meanwhile, his allegations of pattern misconduct are simply allegations by other inmates that they had been assaulted, um, at other points. But that is a direct conflict, if this court were to, uh, hold that that's enough, would directly conflict with the D.C. Circuit's holding in Mitchell. There, the plaintiff alleged that he was, uh, he had testified for the government. Um, he had been placed in a prison known for assaults that, uh, against, uh, government witnesses, and he alleged he'd been assaulted in the past, 17 months before he filed the complaint. But the court held these sort of generalized allegations about the nature of a prison, being known for assaults or not, were not enough to satisfy the statute. The Third Circuit explained the same in Abdul-Akbar. There, the plaintiff alleged that he had been unlawfully pepper sprayed, um, and that the, he alleged other instances of guards physically harassing, uh, inmates, but the court held that that was too generalized and disconnected. So, the level of generality is a line-drawing problem, but it's an important one here because the statutory context. The statute requires a, uh, it provides a disincentive for plaint- uh, prisoner plaintiffs to not file frivolous lawsuits, and that disincentive is only effective, uh, if the exception is not interpreted so broadly that all that's necessary to circumvent the rule is an allegation that other inmates have been assaulted, um, and that's not enough under the statute. Uh, and just to clarify one point about the record, Your Honor, um, the amended complaint ends at, in November 28th, 2018, um, with Hawley's discharge from the hospital. The latest date stated is November 27th, but then it says a day later, so November 28th. Uh, his one attachment to that is a single night in December 2019 where he alleges he had breathing problems and used his inhaler for those and does not assert that his inhaler was ineffective or that he was denied any treatment he requested because of that event. Um, and so, anything after that is, in the, in the Rule 59E motion is, as, uh, Your Honor is pointing out, not fair game under Bannister v. Davis because it would be improper to fall to district court for ruling on issues that were not presented to it. Um, and again, just to close, Your Honor, the, uh, Your Honors, the, um, the statutory background of this case is crucial, and that's something that's missing from Hawley's briefs. Congress noted a significant societal problem when it passed the PLRA. It noted frivolous lawsuits were clogging the federal courts and, as Judge Wynn put it in Taylor v. Grubbs, um, preventing district courts from considering more meritorious claims. And so, it enacted the PLRA to weed out the bad claims and prioritize the good by, uh, providing a disincentive for plaintiffs to file frivolous lawsuits. That disincentive is a three-strike rule, and adopting Hawley's arguments here would render that rule too broad, which means that frivolous lawsuits would, again, be too easy to file and would undo the congressional scheme. Um, this requires no further questions. I'm going to ask Senator Briefs to ask that you affirm. What about the fact that he says that because of the conditions he was in, his lungs are such that he struggles to deal with, survive in terms of breathing? That seems to be something that, I would think, uh, not being able to breathe is pretty imminent, isn't it? Your Honor, we're not disputing the seriousness of the injuries in the past, but the statute is concerned with whether he's in imminent danger of a serious physical injury in the future. And so, when considering that, the... Well, he is, he's asthmatic, right? People who have asthma, they don't just, one day they have an attack and all of a sudden, you know, they're fine. It is a chronic disease, right? And then, what he's alleging, the conditions of which I'm being confined, I am chronically exposed to asthmatic attacks. If you know anything about an asthmatic attack, at the point of it is, it's deadly. This is lethal. It's not a matter of, oh, my chest hurts. No, you can't breathe. How imminent do we have to do? Die first? What? No, Your Honor, two responses to that. One, the Seventh Circuit expressly rejected allegations of a... That's a fine circuit. I know that judges very well, but they're not quite in the Fourth Circuit. So, give me some precedent in terms of that. I know you said the D.C. Circuit, I'll let you go with that. Well, again, Your Honor, the D.C. Circuit hasn't addressed asthma specifically, but... Go ahead. If you want to cite that, it's a wonderful circuit. Go ahead. Okay. Your Honor, Sanders v. Melvin, there, the Seventh Circuit explained that a plaintiff who alleged two different imminent dangers. One was of, he said, a struggle to breathe from asthma from the conditions of his confinement. He said that that was not enough because many harms for many people, including asthmatics, do not end up being serious or do not wind up occurring. And there is no specific allegation in the complaint that showed that any serious injury was imminent from that asthma. It's the same issue here. Hawley alleges that he's being treated for his asthma, which, as the Tenth Circuit explained in Whiteview, Colorado, renders the idea that serious injuries imminent is less plausible under those conditions. And also, the Seventh Circuit in Sanders explained that the other harm was a danger of self-mutilation because the prisoner there had a diagnosed history of mental illness, past attempts at suicide, past self-harm, and was not being treated, allegedly, under the terms of his complaint. And the court held that that was enough because he had specific allegations showing that there was a risk of serious physical injury in the future. Here, Hawley lacks... In this case, is there some allegation, there's some animus, maybe racial reference in this case? Your Honor, that is alleged, but the fact that a... We have to take it forward. We're not trying this case. It's a question whether or not we're going to allow him to have the 300-some dollars to not have to pay that to file a suit, right? We're not here for that. But isn't there allegations about there was a little song that was made about Howard Hawley, the black ass, you don't recall it in the record? Your Honor, I do recall that in the records. Much of that is in the Rule 59e motion, but I believe there are some alleged in the amended complaint. But the fact that a plaintiff is part of a particular class that's threatened is not enough under the Mitchell case, excuse me, for example. Because there, again, the plaintiff alleged that he was part of a class of prisoners who was under particular threat. And then in the Azamani case, also from the D.C. Circuit, the plaintiff alleged that he was particularly personally threatened by his inmate enemies for various characteristics. The D.C. Circuit also considered, went through its previous... He's alleging that correctional officers said this, right? Not just other people, a class of people anger at each other, right? Isn't he alleging that correctional officers said this? Is he or not? He has alleged that, Your Honor. But that, again, does not mean that he's in imminent danger of serious physical injury at the time he filed his complaint. The... Well, if someone said that to you, wouldn't you be pretty frightened in terms of whether or not they're going to help you? I mean, that's the whole point, is imminent. Is both of me... For example, nobody knows when they're going to die, but there's certain situations that make it imminent that you think more of a reason than it might. Would you think it's reasonable if somebody said that? Assuming that's true, you know the court, what did they say? What did they say to him? I don't have the quote in front of me, Your Honor, but I understand what you're talking about. Of course, Your Honor. Because we're here for whether or not it's imminent. I mean, that's the question. Well, Your Honor, I'd say there's a difference between imminence and inevitability. So the idea that harm might occur is not enough under the statute. It must be likely to occur or impending in the near immediate future. They put him in a dog cage, didn't they? That's what you alleged? He alleged that happened, yes, in the past, Your Honor. It doesn't necessarily mean he's in imminent danger. The past informs the present, doesn't it? It does to an extent, but when there's a... You don't want to read that language, do you? I'm looking for it, Your Honor. Yeah, it's at JA10. That's the original complaint, excuse me. Yeah, JA10 is the original complaint where it's listed. Original complaint, right? Yeah, the amended complaint. What did he say he said to him? Your Honor, I prefer not to read it. I acknowledge it's there, but... Well, I didn't ask you a real preference. You asked my question. It's the record. Okay, Your Honor, I'll read this. We're talking about imminence and you're talking about you don't want to call it because it's not tasteful. That's the whole question, whether or not this person should be allowed, I mean, not allowed to bring his action because he is poor, obviously without funds, and the question whether this court determined whether or not that's a imminent danger. Now, are you afraid to read it because of sensibility? Read it. Your Honor, okay, this is as alleged, to clarify. On one occasion, G. Hawley overheard a correctional officer, John Doe, state, there lays old Hawley always writing up... Always writing up reading. Am I allowed to curse? I don't know how you could read what it said without reading what it said. Okay. All right. There lays old Hawley always writing up shit, bitching about no coffee and no juice, good riddance, Hawley dying, cuffed up, nonstop, your black ass to hell, ha ha ha. Your black ass to hell, ha ha ha. But Your Honor, that does not establish... That doesn't mean anything, does it? Your Honor, this is not about the merits of his underlying suit. Exactly. It's about whether or not we question whether or not the conditions of his confinement and what was said to him, what was done and what wasn't done, does inform whether it's imminent. I'm asking you, that means nothing then? You're in prison. He had formerly been transported in a dog cage, bounced around. And then someone says that, like you said, it's alleged, but that's what we're here. We're not determining merits of it at this point. Determine whether or not we're going to allow him to waive $350 or so, so he could bring his action in the federal court. That's what we're here for. Well, we're here to see if this court, to get this court's interpretation of the PLRA. It's a broader statutory scheme and individual case might seem small, but the broader picture... This is right here in the facts of the case. That's what we determine justice in terms of adjudicating the case. And what I'm saying is that means nothing in terms of that being said. We're not saying that means nothing, Your Honor. What does it mean then? Is that imminent? Imagine you were locked up and someone said that to you and then you've already been transported in a dog cage as well as a cage for an animal, and then you're told that. What's a black guy has to go to? Your Honor, these are allegations and allegations in a... That's what complaints are, allegations. And this is a statute that deals with plaintiffs who have a history of filing frivolous allegations, baseless and malicious allegations on three prior... And that has nothing to do... This could be his 100. The question is whether or not he is in imminent danger, not how many he's filed in the past. That's what you started off with your argument. It's no question he has three. So I'm just asking you, you're telling this court that that means nothing. I mean, if that's your argument, I'm not speaking. I just want to make sure you say it. That doesn't matter, right, in terms of imminent. It would be one... I want the government's position on that. That doesn't matter. Your Honor, whether someone is in imminent danger of serious physical injury, as this court explained in Hall, is a combination of all the facts and all the circumstances, and a district court has broad discretion to consider... What about that fact as alleged? I would say that as alleged, that fact would show that one particular unidentified correctional officer harbored animus towards Hawley because of his race. And that does not necessarily establish that he is in imminent danger of serious physical injury, particularly because he does not identify... He's going to be black the whole time he's in there, isn't he? Your Honor, that's, again, that he does not... Can he change that? Can he change that? He does not allege that at the time of his complaint... He didn't say, if you don't stop misbehaving, blah, blah, blah. But he talked about the reference of fouling, and I don't want to say it because we've tested your sensibilities already, but fouling stuff was a reason that prompted... As alleged. That's similar to what the plaintiff alleged in Mitchell, Your Honor, which the D.C. Circuit rejected. The plaintiff there alleged that he was someone who had testified for the government, that he's in a particular danger because he was in a class of persons who had testified for the government, that the prison he was in was known for assaults against plaintiffs who testified against the government. That's generality. This is particularized to him. They named his name. He was mentioned talking directly to him. That's a different... Your Honor, I guess the question is then, is Hawley then excused from the three-strike rule going forward because he will always be able to allege that this occurred, which means that he could always allege that he's in imminent danger if this court buys his theory of this case, which means that the three-strike rule doesn't apply to him. That's a slippery slope argument. I don't know about that, but I know we have to deal with the facts before us. I don't know whether he'll do it or not. I don't know it. Basically, I could do that on anything, whether I thought it was merit or not. Well, you know, if we allow these things further, there will be more and more people coming. Is that appropriate for the government to say this is a slippery slope or not? I hope that this is rare. As he alleges that people say that, as you can attest, you were afraid to even say it in court. It wasn't in your words to read it, let alone imagine being locked up and have no control over your being, your safety, or anything else, what that would be presented to you, I suppose. That's why I asked you again, uh, does it mean nothing for him to think here? Your Honor, if that's the theory, then I struggle to see a limiting principle that would not allow just about any prisoner plaintiff to bring a case and avoid the three-strike rule, which would eviscerate the congressional theory. I hope you're wrong that this is so, this kind of behavior would be so common that it would be a floodgate. You have anything else to say? Uh, no, Your Honor. Just ask the court to affirm it. All right. Thank you. Mr. Poppe, you have some time reserved. Thank you, Your Honors. Uh, I'd like to first clarify, uh, uh, just to make sure that, uh, it's clear for this court, um, that the comment made by the prison official with the racial undertones was in the original complaint, uh, and both admitted complaints, page 10, 28, and 37 of the joint appendix. Um, and then to address Apley's argument about, uh, the Mitchell, the D.C. circuit case in which the court said that there were generalized allegations that, and they faulted the plaintiff for making vague and unspecific allegations. Here, uh, with respect to the pattern, uh, with both, with all pathways, there were specific allegations, but looking particularly to the pattern, um, there were specificity, specificity of all of those allegations with the first, uh, he described in detail the initial cage transport, uh, the handcuffs and the continuing effects with the asthma and ongoing hand and wrist injuries that he experienced, and the, um, repeated failures of the prison officials to give him the requisite standard of care. And I'd like to, uh, point this court to, uh, quote that, um, Mr. Hawley alleges that Assistant Warden Combs was, quote, aware of over 20 years of credible inmate complaints, attorney complaints, and family complaints about Walensridge State Prison's correctional officers' excessive use of force on inmates as a means of punishment and not for legitimate reasons. So Mr. Hawley's specifically alleging that there are, uh, there is animus towards, from the prison officials towards inmates who they perceive to be disruptive, and he has specificity of all of the incidents that involved him and the other inmates with the Richmond Times Dispatch article that he attached in the objections to the answer. Uh, moving, uh, next to the arguments by Apley's, uh, the Seventh Circuit case, Sanders versus Melvin. Uh, Sanders involved, uh, uh, a plaintiff who was suffering, uh, he, he alleged that, quote, the isolation, heat, and restricted airflow in solitary confinement harmed him, uh, by aggravating his asthma. And he alleged a, quote, struggle to breathe. And the court said that mere incidents of, mere, uh, normal incidents of asthma or a mere struggle to breathe are not enough. Here we have much more, uh, much more severe allegations than a struggle to breathe or, uh, simple incidents of asthma. Going back to that initial, uh, instance in which he was lying on the floor of his cell, Mr. Hawley stated he was, quote, nearest death, suffering life-threatening breathing injuries. And all of this is before the motion to alter the judgment with that initial incident. So we have much more than a, um, a mere struggle to breathe or normal incidents of asthma. And I'd also like to point out that Mr. Hawley was 65 years old at the time that he filed his complaint. And, uh, this is not in our, in the briefs, but the American Lung Association has stated that 65 years old and older, uh, chronic asthmatics are 5.9 times more likely to develop, uh, serious pneumonia and then are more likely to develop serious ongoing complications after that. So we have severe specific allegations result with respect to the um, in which there were things such as amputations, coma, uh, different factual allegations than we have here. Hall cites Van Diver for the standard and, um, relies on it, but the specific factual allegations here are very similar to what we have in Hall. Hall involved a plaintiff with asthma, COPD, another lung condition, and the court found that sufficient to remand to the district court to consider whether, in light of the whole record, that constitute constitutes imminent danger. Here, we again have chronic asthma, um, severe chronic asthma, life-threatening injuries, and that puts us very similar, puts this court, uh, very similar to Hall. And then lastly, um, I would just like to touch one more time on the, the injuries to the hands and wrists. The district court did not address whether the hands and wrists could constitute a serious physical injury, an ongoing serious physical injury under Hall, and it should have because Mr. Hawley alleged that he received insufficient care, um, in the initial injury. He, uh, saw a doctor, but no gauze or bandages were applied, and five days after, they stopped giving him medication for his hands. And Mr. Hawley has alleged, uh, ongoing hand and wrist pain, throbbing, and nonstop electric tingling, both wrists, and loss of grip daily, all before the motion to amend or alter the judgment. Um, and he stated that the injuries necessitate treatment from a nerve specialist and physical therapist. And he has, there's no indication in the record that he has received that treatment for the, the hands. So Mr. Hawley has alleged two ongoing serious physical injuries related to his worsening chronic asthma, and the injuries and the permanent disfigurement to his hands and wrists. And he has also alleged a pattern of misconduct that evidences a serious- It just seems to me that a case like this, the issue here is whether he should be given an informal pauper, pauper status. You have the PLRA that was put in place to streamline these cases, and yet look like, look what we're doing. We've been all this time with the district court going on and on about whether this guy should be able to go informal paupers. We've had a hearing up here going on and on about it. We could probably resolve this thing, just let me go forward without going through this. I mean, but you know, if, I guess if we do, then we just let everybody through. But it seems like, uh, there should be some standard that maybe this is one of those instances in which, uh, I don't know if we do it this instance or whether it comes from the legislative side of, of saying, you know, in the interest of judicial economy, a term that I used earlier, a court ought to do that, that might streamline the case more so than to go through what we're going through now. Because at the end of the day, even if we go for you, what you're going for, grant you this relief, your client gets no relief. All he gets is to go back and now go through the proceeding. There's nothing going to happen here other than saying he gets a chance to be heard. And that really sounds like we're just spinning wheels at the end of the day. But there are some important points here that will affect other cases. I recognize that. So thank you for your time. Yes, Your Honor. Thank you. Thank you, Mr. Poppe. Mr. Virch, I want to give, make sure you give the due, please introduce these litigants, file it against the court. Yes, Your Honor. Come on up. Thank you, Your Honor. I'm Thomas Virch from the University of Georgia. And you just heard from Mr. Poppe, Zach Poppe, who's a 3L in my appellate clinic at the University of Georgia. And along with him on the brief was Ms. Taylor Steglein. Both helped me write the briefs, both helped prepare for the argument. And of course, Mr. Poppe presented argument today. Thank you, Your Honor, for letting us do that. Thank you so much. It was well done. Georgia Bulldogs acquitted themselves well. Thank you, Your Honor. And also, too, I'd note that you're a court opponent. We appreciate the work of counsel like yourselves and these fine law students to come here before us. It means a lot for our court and justice and voices being heard. Thank you so much. And also, obviously, counsel Abel Lefkowitz of the Commonwealth as well. Thank you so much. We'll come down and greet counsel and proceed to our final case for the morning.
judges: Roger L. Gregory, James Andrew Wynn, Toby J. Heytens